Filed 8/26/16 In re J.N. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.N. et al., Persons Coming Under the Juvenile Court Law. | H043299<br>(Santa Clara County<br>Super. Ct. Nos. JD19652, JD13746,<br>JD19668, JD23124, JD23125) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>M.P.,<br><br>     Defendant and Appellant. | |

The Santa Clara County Department of Family and Children's Services (Department) brought a petition seeking to terminate M.P.'s visitation with his children during the reunification period. (Welf. & Inst. Code, § 388.)[1] The juvenile court granted the petition. Appellant contends that the order is not supported by substantial evidence that visitation posed a threat to his children's physical safety. We affirm.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

## I. Factual and Procedural History

Appellant and L.N. (the mother) have five children:  Jasmine was born in September 2001; Abel was born in June 2005; Destiny was born in April 2008; Michael was born in May 2009; and Antonio was born in December 2012.

### A. Prior Dependency Cases

In May 2002, Jasmine became the subject of dependency proceedings when she was eight months old.  Jasmine had been placed in protective custody after the mother was involved in a domestic violence with F.E.  The mother had identified F.E. as the alleged father.  The mother had a substance abuse history and was incarcerated for an outstanding warrant for narcotics.  In July 2002, Jasmine was made a dependent of the court.  Paternity was not established at that time.  The juvenile court returned Jasmine to the mother's custody after 12 months of reunification services.  The case was dismissed after six months of family maintenance services.

In May 2009, a second dependency petition was filed.  When Michael was born, he was placed into protective custody after he and the mother tested positive for amphetamines.  The mother identified appellant as one of three alleged fathers.  It was alleged that appellant had a criminal history and was required to register as a sex offender due to a conviction for a lewd act with a child under the age of 14.  His whereabouts were unknown.  Appellant's sex registration requirement was the result of his relationship with the mother when she was 12 years old and he was 24 years old.  Though appellant was convicted based on the mother's testimony, she subsequently claimed that there had been no sexual conduct between them.  Based on the same allegations, the Department also filed a petition in connection with 14-month-old Destiny.[2]

---

[2]  Abel and Jasmine lived with maternal relatives.

In June 2009, the petition was amended to include allegations that appellant denied paternity and had a history of assaultive and verbally abusive behavior, including, but not limited to, emotional and physical abuse of the mother.

When the social worker interviewed appellant for the jurisdiction report, he claimed that he did not know the mother or her immediate family and he was not the father of either Destiny or Michael. He stated that he was a transient and he did not want to take responsibility for the children. The jurisdiction report also referred to a prior domestic violence incident in which appellant repeatedly hit the mother while she was six months pregnant and threatened her if she called the police. On another occasion, appellant was involved in a property dispute and he punched the victim.

In August 2009, Michael and Destiny were declared dependents of the court. The juvenile court ordered that they remain in the mother's custody with family maintenance services and that appellant have no contact or communication with the children. In January 2011, the dependency case was dismissed.

### B. Current Dependency Case

On February 24, 2015, Jasmine, Abel, Destiny, Michael, and Antonio were taken into protective custody after the mother took them to the Valley Health Center while she was under the influence of methamphetamine. The police did not release the children to appellant because he was a registered sex offender and had a volatile relationship with the mother. Two days later, the Department filed individual petitions alleging that each child came within the jurisdiction of the juvenile court under section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). The petitions alleged that the mother had an extensive history of substance abuse and crimes associated with her substance abuse and that appellant had failed to protect the children from the mother's substance abuse. It was also alleged that appellant's criminal history began in 1995 and included several

3

misdemeanor and felony convictions. The petitions further alleged the prior dependency proceedings.

According to the initial hearing report, the mother stated that appellant was the father of all the children. Appellant also told the social worker that he was the children's father. According to appellant, he was unaware that the mother was using drugs again. Appellant stated that he could live with the children because he was no longer on parole. He was currently living in a mobile home behind the mother's home.

At the initial hearing on February 27, 2015, the juvenile court ordered that the children be detained. The juvenile court also found that appellant was the presumed father of all five children.

The jurisdiction report, which was dated March 18, 2015, recommended that the amended petitions[3] be sustained. The report summarized appellant's criminal history. He was a registered narcotics offender until March 2011 and a registered sex offender for life. He had five prior felony convictions, including possession of a controlled substance, three counts of failure to register as a sex offender, and lewd conduct with a child under 14. He had 13 prior misdemeanor convictions, including two counts of use of a controlled substance, resisting a public officer, three counts of failure to appear, and seven counts of driving with a suspended license. Appellant stated that he had never seen any drugs or paraphernalia in the home. Though he was aware of the mother's past dependency cases, he did not know that she was using drugs until her recent arrest. Appellant "implied that he would be able to notice the signs [of the mother's drug use] since he used to use the drug himself." Appellant declined any services or referrals, because he "'did all that'" while he was incarcerated. He also stated that he "'hasn't done anything wrong.'" Appellant interacted with the family almost daily. However, the

---

[3]     On March 17, 2015, the Department filed amended petitions as to each child.

4

mother and children lived in "Section 8" housing and Section 8 guidelines prohibited appellant, as a registered sex offender, from living with them.

The social worker noted that both parents denied that they were in a relationship when she was a minor. However, they admitted to being in a relationship for 18 to 20 years which indicated that they began their relationship when the mother was approximately 14 to 16 years old and appellant was 25 to 27 years old.

It was noted that the prior child welfare history included several referrals and two cases. The recurring themes were concerns regarding substance abuse by the mother, inappropriate discipline, violence in the home, inadequate supervision, and chronic lice causing the children to frequently miss school. Destiny told the social worker that appellant had punched her a long time ago. According to Destiny, Antonio was slapped on the bottom and Michael was hit. Her parents never hit each other, but they yelled and swore.

The disposition report, dated April 15, 2015, recommended that the juvenile court sustain the amended petitions and order reunification services for appellant and the mother. Though appellant indicated that he was able to determine when the mother was under the influence of methamphetamines, he felt "conflicted about taking the children from their mother or confronting [her] about her substance abuse." Appellant arrived at the parenting orientation session, but was not allowed to attend because he arrived approximately 10 minutes late.

Appellant completed three random drugs tests, which were all positive for THC. Appellant did not believe that his marijuana use affected his ability to parent his children. He provided a recently issued medical marijuana card and stated that he intended to continue using marijuana.

The disposition report summarized the children's welfare. Jasmine, who was 13 years old, was doing well in school. However, she reported that she was sad and cried

frequently, because she could not return home. She was willing to try therapy and a referral was made for her. Nine-year-old Abel was a good student. However, he was behind academically, because he had 12 absences and 16 tardies due, in part, to chronic lice. Prior to removal from his home, he was acting out in class. However, his behavior had improved recently. A counseling referral was made for him. Destiny, who was six years old, did not have many friends at school and struggled with listening and following directions in the classroom. She was also very defiant on several occasions and had tantrums. She was behind academically due to 19 absences related, in part, to chronic lice. Destiny was referred for counseling. Five-year-old Michael had a difficult time relating to peers at school. He was behind academically because he had 16 absences due, in part, to chronic lice. He also had a difficult time following directions. The school was considering keeping him in kindergarten for another year. He was also referred for counseling. Antonio was two years old. He had delayed speech and still drank from a bottle. He was referred to speech therapy and early childhood special education.

The children visited with their parents twice a week for two hours. The visits were going well. The parents usually brought food and the family played board games, watched movies, or played with toys during the visits. Both parents and the children needed to be reminded not to use curse words. The parents also occasionally argued and bickered with each other, but were able to stop themselves.

On April 15, 2015, the jurisdiction and disposition hearing was held. After the parents submitted on the amended petitions and the reports, the juvenile court sustained the petitions with further amendments, declared the children dependents of the court, removed them from their parents' custody, and ordered reunification services for the parents. Appellant's case plan required him to participate in the parent orientation class, a parenting class, counseling, weekly random controlled substances testing, a substance

6

abuse assessment, and any recommended substance abuse treatment. The juvenile court also ordered two supervised visits a week for two hours.

In June 2015, the Department received seven-day notices to move the children from their foster homes because of behavioral issues and chronic lice. The Department was in the process of negotiating with the housing authority and the landlord to move the children back into the mother's Section 8 house in the care of the paternal grandmother. The foster parents had agreed to extend the time necessary to remove the children.

Appellant was assessed for substance abuse. Appellant reported that he used medical marijuana to manage pain four to five times a week. According to the assessor, appellant presented with distorted views and blamed others for his current situation. It also appeared that appellant used control and manipulation to deal with the mother's substance abuse. Appellant expressed no remorse for his criminal history. He acknowledged that he had a history of opioid use, but he stated that he had been "drug free" since 1989. The assessor did not recommend treatment, but he advised appellant to attend codependency meetings.

An interim review report, which was dated September 15, 2015, informed the juvenile court that the paternal grandmother was not able to assume the Section 8 housing voucher and the children were moved to foster homes.

The interim review report also discussed the difficulty in eradicating the children's lice. The foster mother for Abel and Michael treated the lice whenever it appeared and took the boys to a special lice salon and a physician. When appellant was informed that the foster mother had requested that their hair be cut to facilitate the lice treatment, he became "enraged," discussed the disrespect to his Azorean heritage, and threatened legal action. The foster mother for Destiny and Jasmine also took preventative measures to eradicate the lice. Though Jasmine had been free of lice for several weeks, Destiny returned from visitation with lice. The foster parents had administered treatments and

7

washed all bedding and clothing, but they had been unable to permanently eradicate the lice.

The interim review report discussed visitation, which had been complicated by transportation issues as well as the children's lice. Since there was a lapse in visitation, makeup visits had occurred. In mid-July, the mother stated that she no longer wanted joint visits with the father. Staff also reported at this time that they had called the police to intervene, because appellant had been driving for hours around the transitional housing unit where the mother lived. When the social worker told appellant of the change to separate visits at the mother's request, he became volatile and did not believe the social worker. Despite reminders from the visitation supervisors, appellant made disparaging remarks to the children about the mother. Appellant also told the children that the mother manipulates them, they did not need to obey her all the time, and her "'side of the family are all dope fiends.'"

On September 15, 2015, the juvenile court ordered the children to have their hair cut if there was no other solution to eradicating their lice.

About three weeks later, the court designated child advocate for Michael submitted a report. Michael had told her during many outings that he wished he could cut his hair. He became frustrated and angry when they were in public and people thought he was a girl. He stated that he wanted short hair that he could style and spike and that he had hair gel ready at home for this hairstyle. Michael was afraid that his brother and appellant would be very angry with him if he cut his hair. He was afraid appellant would yell at him and "'might even hit him.'" The advocate recommended that Michael's hair be cut for his emotional well-being.

The six-month review report, which was dated October 7, 2015, recommended that family reunification services continue for both parents. It was noted that Jasmine had decided to cut her hair. When appellant saw her, he commented that she looked "like

8

a douche with shorter hair." The report set forth the children's struggles with various emotional and behavioral issues. Appellant repeatedly talked about the mother, her drug use, and her new boyfriend during visits with the children and he later signed an agreement to refrain from speaking negatively about the mother in front of the children.

An addendum report, which was dated October 7, 2015, summarized discussions between the social worker and appellant. Appellant now claimed that he was aware that the mother had been using drugs and he instructed his children to destroy the drugs and drug paraphernalia. Appellant denied acts of violence in his relationship with the mother, but he did admit arguments during which they would yell. He explained that since he was a "three striker" he argued with the mother in public so he could not be accused of violence. He admitted that the neighbors would call the police during some of these arguments. The social worker and appellant also discussed the juvenile court's order to cut the children's hair. Appellant recognized that there was a problem with the children's lice, but he was vehemently opposed to having their hair cut.

According to the addendum report, the four eldest children were screened at the lice salon and found to have lice. The technician informed the social worker that the foster parents, their families, and the children's parents needed to be treated for lice to prevent reinfestation in the children. The social worker contacted the parents and told them that visits would be canceled until they were able to be screened or treated for lice. The mother was found to have lice and was treated. There is no indication that appellant was screened or treated.

The social worker informed appellant that Abel, Destiny, and Michael would be getting their hair cut. Jasmine would not have her hair cut, because it had already been cut recently. When told that Michael wanted short, spiky hair, appellant stated that he did not know or understand what he was asking for. After Michael and Destiny had their hair cut, they were smiling and expressed that they really liked their new hair styles. Though

9

Abel appeared to like his haircut, he appeared a little worried. The social worker spoke to appellant about his children's haircuts. When he heard that Michael had a short, spiky hairstyle, appellant became irate and yelled that he had made it clear that the boys were not to have their hair cut any higher than their shoulders. Appellant repeatedly stated that the social worker had disrespected him, told her that he could no longer work with her, and hung up the phone. He called back a few minutes later and asked for the contact information for the social worker's supervisor. Appellant then made calls to the supervisor and the social worker and left angry, profanity-laced phone messages.

On November 4, 2015, the juvenile court held the six-month review hearing. Reunification services were continued to the 12-month review hearing. The issue of reasonable services was set over to another date. Five days later, the juvenile court found that reasonable services had not been provided.

On December 30, 2015, the Department filed a section 388 petition seeking an order terminating appellant's visitation. The petition alleged that the children's visits with appellant were detrimental to their safety and well-being. Appellant repeatedly yelled at the children and at the social workers and security officers in front of the children. Antonio appeared afraid of appellant. After Antonio was transported to a recent visit with appellant, he clung to the social worker's leg when he saw appellant. Appellant "appeared very angry" and yelled repeatedly "You're going to see what's going to happen!" While Antonio played by himself, appellant made fun of him and what he was wearing. Appellant yelled at Antonio for a haircut. After the other children arrived, appellant continued to yell about the haircut and Abel quickly said he was letting his hair grow out. As appellant yelled at Antonio about his haircut, Antonio held his arm across his face. Jasmine intervened and comforted Antonio.

On December 19, 2015, the children had a visit with the mother. Michael knew that his visit with appellant followed the visit with the mother and his behavior began to

change at the end of this visit. He became upset and crawled under a table where he remained until appellant arrived. The visitation supervision social worker attempted to inform appellant about Michael's behavior, that Abel was with his mentor and on his way to the visit, and that Michael and Abel would be leaving the visit an hour early due to transportation issues. Appellant talked over and screamed at the visitation supervision social worker. He stated that he did not give his son permission to go with the mentor. He also yelled that he was in control and said, "I'm gonna take control, watch you'll see!" Appellant ignored Jasmine and Destiny. While Michael remained under the table, appellant pointed at him, yelled at him, and asked what was wrong with him. Appellant continued to repeat that he was in control and would take control. Appellant "aggressively and violently" pushed the table against the wall, which made a loud noise. He then grabbed Michael by one arm, pulled him out from under the table, and "forcefully" pulled him up. The security officer entered the room, told appellant to put the child down, and asked him to leave. Appellant left immediately. Michael repeatedly told his caregiver that he had been frightened and told his social worker that he was scared.

When the incident was discussed with Destiny, she asked the social worker, "Do you know what my dad is happy about?" The social worker asked, "What is he happy about?" Destiny responded, "Nothing!" According to Jasmine, Michael seemed scared and that appellant's behavior seemed normal for him. Abel, who had not been present, tried to defend appellant.

The social workers, who had supervised visits for appellant or been involved with him regarding the visits, stated that his yelling and aggressive behaviors have been escalating during the past couple of months. His behavior was unpredictable and all the children were at risk of becoming the target of one of his outbursts.

11

The juvenile court scheduled a hearing on the section 388 petition and ordered that appellant's visitation be temporarily suspended pending the hearing.

On January 6, 2016, the juvenile court scheduled an evidentiary hearing on the section 388 petition. The juvenile court also noted that "whenever [appellant] is in front of this Court, and again today, he is mocking the Court. He makes eye contact with his son, Abel, who this Court feels Abel has to protect his father and has to support his father, which again is inappropriate."

About a month later, the Department submitted an addendum report. Appellant had contacted the program manager for the social worker and they discussed his concerns. The program manager told him that the Department and the social worker were willing to communicate with him and support his efforts to reunify with his children by participating in his reunification plan. The program manager also instructed appellant to contact the social worker. However, appellant had not contacted the social worker for over a week after this conversation.

The social worker contacted law enforcement about appellant's visitation. The deputy sheriff opined that appellant's behavior would not necessarily change if an officer was present during the visit. His opinion was based on appellant's disregard for the social workers and protection officers who were present during previous visits. He did not recommend law-enforcement supervised visits. The Department recommended that appellant engage in individual therapy and the conflict and accountability program to help him make the necessary changes so the children could safely visit him. Transcripts of appellant's most recent profanity-laced phone messages to the Department were attached to the report.

The contested hearing was held on February 1, 2016. Katie Hartung, a social worker, testified as an expert in the areas of risk assessment and placement of dependent children. She had been the social worker on the case since October 2015. She prepared

12

the section 388 petition because appellant engaged in "escalating and aggressive behaviors both toward the supervising social workers and the children, including yelling, and then also increasingly physically aggressive behaviors towards the children." She described the December 19 visit in which appellant argued, yelled at the social worker and some of the children, pushed the table against the wall, grabbed Michael, and pulled him out from under the table. After a security guard asked appellant to leave, he did so. Michael ran to a corner and curled up in a fetal position.

Hartung also testified that there had been other times when the children reported feeling scared of appellant. She opined that suspension of appellant's visitation would be in the children's best interest because it would be important for them to be able to feel safe during the visits. The foster parents had reported behavior changes surrounding the visits with appellant. Antonio would act out for a day or two after visits. Prior to the suspension of appellant's visitation, Abel and Michael would act out prior to and after visits with appellant. Hartung noted that the children's behavior during visits had improved since appellant's visitation was suspended.

According to Hartung, appellant had completed the parent orientation class but he had not participated in any other case plan activities. Hartung also believed it would be helpful if appellant communicated with her or someone else from the Department. He had become upset with her many times and hung up on her. She had written a letter to appellant since she was not able to communicate with him in person or on the telephone. Another social worker delivered the letter to him and he threw it away.

Appellant often yelled at the social worker or at the children during visits. He told Jasmine that he did not want her to become a "bull-dike," yelled at Antonio after his hair was cut, and became upset with Michael about his hair. Appellant brought up the subject of haircuts at almost every visit. He degraded and humiliated the children with his

13

comments. Hartung was concerned because appellant's behavior was unpredictable and had escalated to the point of physical aggression.

Following argument, the juvenile court granted the section 388 petition. It found that there had been a change of circumstances. The juvenile court stated: "I think by clear and convincing evidence it would be detrimental to these minors for visitations to continue. The father is unpredictable. He had uncontrollable anger issues, his belittlement of his children, I think, clearly, negatively, emotionally affects the children and poses a physical safety issue. . . . The children love their parents, but I think it's outweighed by the need for safety here."

## II. Discussion

Appellant challenges the sufficiency of the evidence to support the order terminating visitation with his children.

"The overarching goal of dependency proceedings is to safeguard the welfare of California's children. [Citation.] 'Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced.' [Citation.]" (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.) "An obvious prerequisite to family reunification is regular visits between the noncustodial parent or parents and the dependent children . . . ." (*In re Julie M.* (1999) 69 Cal.App.4th 41, 49.) "Visitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) However, "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B).) We review an order terminating visitation for substantial evidence standard. (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.)

Appellant relies on *In re C.C.* (2009) 172 Cal.App.4th 1481 (*C.C.*) and argues that the juvenile court erred when it terminated visitation in the absence of a threat to the

children's *physical safety*. The Department points out that *In re Brittany C.* (2011) 191 Cal.App.4th 1343 observed that the *C.C.* court incorrectly interpreted the statute, and the juvenile court was permitted to suspend visitation if there was a threat to the child's *emotional well-being*. We need not take a position on this issue because the juvenile court's ruling here was proper even under the standard set forth in *C.C.*

Here, appellant became increasingly verbally abusive to the children during the reunification period. He repeatedly yelled at them and made degrading and humiliating comments to them during the visits. The children reported that they were scared of him. Thus, there was overwhelming evidence that appellant posed a threat to the children's emotional well-being. Appellant's behavior escalated from verbal abuse to physical violence when he slammed the table against the wall and forcefully pulled Michael out from under the table. Though the physical violence involved only Michael, appellant's behavior was unpredictable and could have been aimed at any one of the children. Appellant argues that "proper supervision of [him] during visits could eliminate any threat to the children's safety." However, a social worker and a security guard were nearby during the incident and neither was able to prevent appellant from grabbing Michael. Thus, there was substantial evidence to support the juvenile court's finding that visitation jeopardized the safety of the children.

### III.    Disposition

The order is affirmed.

15

_____
Mihara, J.

WE CONCUR:

_____
Elia, Acting P. J.

_____
Bamattre-Manoukian, J.

16